C.W. HOWES, et al., Plaintiffs,

v.

Orin E. ATKINS, et al., Defendants.

Civ. A. No. 83–279.

United States District Court,
E.D. Kentucky,
Covington Division.

Sept. 2, 1987.

**1022**

Ron Parry, Covington, Ky., Marcus Carey, Ft. Mitchell, Ky., Timothy Bouscaren, William E. Santen, Cincinnati, Ohio, for plaintiffs.

John McCall, Louisville, Ky., for Bill McKay, Jr.

Merrill G. Davidoff, Philadelphia, Pa., Erwin A. Sherman, Louisville, Ky., for objectors.

William E. Johnson, Frankfort, Ky., for defendant, Ashland Oil, Inc.

## OPINION AND ORDER

BERTELSMAN, District Judge.

This matter is before the court on the applications of numerous plaintiffs' and objectors' attorneys for an award of attorney's fees under the equitable common fund-common benefit doctrine, following settlement of this shareholders' derivative action. *See generally*, H. Newberg, *Attorney Fee Awards*, § 2.01 (1986). Under-standably, the movants suggest a "lodestar" approach to the fee award issue, since they have all logged a cornucopia of hours and expenses. The problem with this approach is that if all the fee petitions were granted the fees would exceed the settlement. The plaintiffs were only marginally successful in this litigation; therefore, an award in the amount of the reasonable value of the plaintiffs' attorneys' time and expenses would not only unduly diminish the settlement fund but completely devour it.

Therefore, the court has concluded that the attorney's fees in this common fund case should be awarded on the basis of a percentage, rather than with a lodestar analysis.

### FACTS

The facts underlying these fee applications are greatly summarized, being set forth only to the extent required to understand the court's rationale in making the fee awards. A more detailed history of the litigation may be found in the notice to the shareholders describing the settlement, which is attached to this opinion as an appendix.

This is a shareholders' derivative action, seeking recovery on behalf of Ashland Oil against some of its officers and directors for alleged illegal bribes using corporate funds assertedly paid to foreign officials to secure oil for Ashland in violation of the Foreign Corrupt Practices Act (FCPA). 15 U.S.C. § 78dd–1.

This simple statement of the main thrust of the action belies its complexity. The alleged bribes, if there were any, were cleverly disguised in the form of foreign investments. Other complex factual and legal issues were: whether the individuals who were benefited by the payments, if any, were indeed foreign officials or merely influence peddlers; whether the corporation sustained any damage, since the alleged bribes may have been necessary to secure needed oil for corporate operations; and whether the FCPA implies a private right of action.

After some two and one half years of discovery, plaintiffs' attorneys lost their enthusiasm for the action because of the expenses of the litigation and the fact that discovery was not disclosing the hotbed of corruption they had anticipated. Also, they have been unable to uncover any tangible evidence of personal profit by the defendants.

In any event, in August 1986 the parties approached the court with a proposed settlement. In due time, the settlement was reduced to writing and formal notice sent to all shareholders with a time set for filing objections. Some objectors appeared, principally Pauline Mickler. The attorneys for the objectors expended substantial hours in discovery, but were unable to improve the terms of the settlement.

The terms of the settlement were that Home Insurance Company, the officers' and directors' liability insurance carrier for Ashland, would pay $1,000,000 to the corporation as settlement of damages for the alleged illegal activity and $2,000,000 to the defendants' attorneys as legal fees for the litigation. Home had defended on a reservation of rights, based on an exclusion in the policy. Further, certain injunctive relief was provided for, the thrust of which was that the General Counsel of Ashland would pay greater attention to corporate affairs to insure that no future violations of the FCPA occurred. Again, the reader is referred to the appendix for a more detailed description of the terms of the settlement.

Although the settlement was represented to the shareholders as a $3,000,000 settlement, the court concludes that it should be considered only as a $1,000,000 settlement. The court finds as a fact that the plaintiffs' attorneys contributed nothing toward the $2,000,000 paid to the defense attorneys. Although Home's position with regard to its reservation of rights had an arguable basis, it was the obligation of Ashland rather than that of the plaintiffs' attorneys to negotiate with Home.

Plaintiffs' attorneys rely heavily on the injunctive relief supposedly obtained by them as a part of the settlement, claiming it was of great benefit to Ashland and justifies an award of fees in its own right. The court finds as a fact that the injunctive relief was illusory in that after Ashland's traumatic experiences any prudent board of directors and general counsel would in any event have pursued the measures provided for in the injunctive relief.

Therefore, the court finds that the true settlement to be considered as a basis for the attorney fee award is only in the amount of $1,000,000.

### ANALYSIS

#### A. Percentage Rather than a Lodestar Award.

As discussed above, the total of the applications for fees in this case exceeds the value of the settlement as determined by the court. A summary of the applications of the various attorneys follows:

| Counsel | Hours Worked [1] | Fees Claimed [2] | Expenses [3] | Total Amount Claimed [4] |
|---|---|---|---|---|
| Robinson, Arnzen, Parry & Wentz (Plaintiff class) | 1,964.25 | $273,544.00 | $30,096.57 | $ 303,640.57 |
| Marcus Carey (Plaintiff class) | 1,458.36 | $164,559.60 | $ 8,193.75 | $ 172,753.35 |
| Walker, Chatfield & Doan (Plaintiff class) | 910.4 | $158,699.25 | $ 2,063.24 | $ 160,762.49 |
| Santen, Shaffer & Hughes (Plaintiff class) | 251.13 | $ 46,921.50 | $ 213.25 | $ 47,134.75 |
| Berger & Montague (Objector Mickler) | 1,523.38 | $152,923.87 | $36,114.22 | $ 189,038.00 |

| Counsel | Hours Worked | Fees Claimed | Expenses | Total Amount Claimed |
|---------|--------------|--------------|----------|----------------------|
| Erwin Sherman (Objector Mickler) | 600.75 | $ 72,056.20 | $ 7,177.53 | $ 79,233.73 |
| Brown, Todd & Heyburn (McKay) | 515.6 | $ 74,366.00 | $10,762.60 | $ 85,128.60 |
| | | | | $1,037,691.58 |

[1] Includes hours worked by lead counsel, associates and paralegals.

[2] Includes fees of lead counsel, associates and paralegals at their respective pay rates.

[3] Includes all expenses including Special Masters' expenses.

[4] Fees plus expenses.

---

The movants have presented their petitions utilizing a lodestar analysis, that is, assigning a basic hourly rate and adjusting it for various factors. Most of the attorneys recognize that, even with a lodestar approach, a downward adjustment for the limited success achieved would be appropriate. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Foster v. Board of School Commissioners*, 810 F.2d 1021 (11th Cir.1987); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296, 1312 (E.D.N.Y.1985).

Without making a formal holding on the matter, the court will state that it has no reason to doubt the accuracy and reasonableness of counsel's claims for hours expended on this litigation and advances of expenses. The court holds, however, in the exercise of its discretion that the lodestar approach is not appropriate for determination of these motions because of the limited success achieved. Because the settlement was a nominal one, the hours expended by counsel are far out of proportion to the results achieved. Nor do the hours expended by the various attorneys necessarily reflect their respective contributions to achievement of the limited results. Therefore, using the lodestar approach would be grossly inequitable to the shareholder class. Although a lodestar analysis even in a common fund case is not illegal, the court in the exercise of its discretion finds it would be inequitable and inappropriate for reasons hereinafter explained.

Recent decisions make it clear that a lodestar analysis is usually inappropriate in cases of this kind and indeed in most common fund cases. There has been a trend away from the lodestar approach and back to a percentage award in common fund cases. Originally percentage awards were routine in common fund cases but fell into disfavor because they were perceived to result in excessive awards. *See* Coffee, *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is not Working*, 42 Md.L.Rev. 215, 239–42 (1983) (hereinafter Coffee, *Rescuing the Private Attorney General.*) This development received momentum from the dictum of the Supreme Court of the United States in *Blum v. Stenson*, where the court observed: "Unlike the calculation of attorney's fees under *the 'common fund doctrine' where a reasonable fee is based on a percentage of the fund bestowed on the class*, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation." 465 U.S. 886, 901, n. 16, 104 S.Ct. 1541, 1550, n. 16, 79 L.Ed.2d 891 (1984). (emphasis added).

The Supreme Court having tossed this ball onto the playing field, other courts have picked it up and run with it. *See Edmonds v. United States*, 658 F.Supp. 1126 (D.S.C.1987), and cases there cited. The court agrees with the observations of Judge Blatt in the *Edmonds* opinion and the reader is referred to it for a more detailed discussion of the history of and recent developments in the common fund doctrine. *See generally*, Coffee, *Understanding the*

*Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions,* 86 Colum.L.Rev. 669 (1986), (hereinafter Coffee, *Understanding the Plaintiff's Attorney* ); Coffee, *Rescuing the Private Attorney General, supra;* Comment, *Nonpayment Risk Multiplier: Incentives or Windfalls?* 53 U.Chi.L.Rev. 1074 (1986).

The court has also been greatly aided in its analysis by the discussion of the resurgence of the common fund doctrine in H. Newberg, *Attorney Fee Awards,* Ch. 2 (1986). An exhaustive treatment of the subject may be found in this work. Some points particularly applicable to the matter at issue are:

1. The lodestar approach in common fund cases causes serious problems. H. Newberg, *supra* at 43. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1305–06 (E.D. N.Y.1985); Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 246–49 (1985) (hereinafter Third Circuit Report).

2. A percentage award supported by appropriate findings is the preferable method in common fund cases. *Id.* at 47, 53. *See Rothfarb v. Hambrecht,* 649 F.Supp. 183 (N.D.Cal.1986); Third Circuit Report at 255; *Commonwealth of Puerto Rico v. Heckler,* 745 F.2d 709 (D.C.Cir.1984); *Edmonds v. U.S.,* 658 F.Supp. 1126, 1143 (D.S.C.1987).

3. Percentage awards in common fund cases recognize the economics of litigation practice. Plaintiffs' litigation practice, given the uncertainties and hazards of litigation, must necessarily be result-oriented. It matters little to the class how much the attorney spends in time or money to reach a successful result. H. Newberg, *supra* at 48.

4. In common fund cases attorney's fees should not usually exceed 50% of the fund recovered and are typically in the 20% to 30% range. *Id.* at 51–52.

5. Weight assigned to the monetary results achieved should predominate over all other criteria in making attorney's fee awards in common fund cases. *Id.* at 41.

6. Newberg notes:

"When multiple law firms participated jointly in recovering a common fund for the benefit of the class, the court should reach an overall reasonable fee award for all counsel based on a fair percentage of the fund, and rule that allocation of the fund is a private matter among counsel. In the absence of an allocation agreement among ... counsel which should be encouraged by the court, the court will allocate that overall award among participating counsel based on reasonable efforts and relative responsibilities they exercised (not necessarily correlated to the hours expended) leading to the creation of the common fund...."

This allocation is to be determined in the court's discretion. H. Newberg, *supra* at 53–54, 59–60. *See also Manual for Complex Litigation,* Second § 24.13 (2d ed. 1985).

7. And particularly applicable to this case:

**"Modest Fund Compared to Hours**

When the fund is modest in comparison to hours expended, the small size of the fund is necessarily a limiting factor in the amount of any fee that will be awarded from that fund. The amount of the fee award may be insufficient to compensate for reasonable hours expended, though the percentage of the fund which is awarded may be higher than the normal range of percentage awards, in order to reach a reasonable fee that may not even cover time spent. *As a rule of thumb, courts usually do not award more than 50 per cent of a fund recovered* in order for the fee awarded not to consume a disproportionate part of the fund recovered, but there are precedents which permit higher awards under the circumstances involved." H. Newberg, *supra* at 54. (emphasis added).

The court is in agreement with these criteria and hereby adopts them. In com-

mon fund cases such as this, where success is extremely limited in comparison to the effort and expense invested by plaintiff's attorneys, and indeed in most common fund cases, the lodestar simply does not work in an economical and fair manner.

In a case of this kind the lodestar formula has many vices. First of all, it encourages unjustifiable proliferation of hours or "churning" by counsel. In effect, it permits the attorneys for plaintiffs to assure themselves of a fee, even though no commensurate benefit has been received by the client class. It also presents a great incentive for collusion. This is especially true where nonpecuniary relief is a part of the settlement. The court has no reason to believe that conscious collusion has occurred here. But the fact is that large fees are being claimed here on the basis of nonpecuniary relief that the court finds to be entirely cosmetic. Thus, a kind of "counterfeit currency," which inflates the value of the settlement, has been created. The economic factors tending to generate such a phenomenon have been well described in a 1983 article by Professor John Coffee. Reading Professor Coffee's discussion in connection with the record in this case creates an ineluctable sense of *deja vu.*

> "The inherent potential for collusion between parties has been greatly enhanced by the recent acceptance of nonpecuniary settlements and by the transition away from a percentage-of-the-recovery formula. The potential for collusion, of course, is present in any class or derivative action, because an inherent conflict of interest exists between the attorney and the class he represents. The latter is interested in the size of the settlement; the former, in the size of his fees.... Because the typical class in antitrust, securities, or corporate litigation is widely dispersed and receives only a de minimis recovery on an individual basis, its members typically have little ability or incentive to pay close attention to the case, and hence the defendant may be able to exploit this conflict simply by offering a higher award of attorneys' fees than could be obtained after a litigated victory for the plaintiff.

> "1. *Nonpecuniary settlements*—The inherent conflict of interest between the plaintiff's attorney and the class he represents predates any recent development, but it has been intensified by the advent of nonpecuniary settlements. These settlements in effect allow the parties to create a counterfeit currency with which to inflate the value of the settlement in order to justify a substantial fee award without the defendant incurring any counterbalancing loss. Increasingly, the pattern in derivative actions is for the action to be settled on the basis of nonpecuniary relief: a new audit committee is appointed, corporate by-laws are revised, some additional disclosures are made, and the claim for damages is dropped. The corporation in whose name the action is brought (and not the individual defendants) then pays the plaintiff the reasonable value of his attorney's fee to compensate him for the 'success' he has achieved. The net result is that the plaintiff's lawyer is well paid, the defendant incurs only nominal financial liability, and the intended beneficiaries of the action—the stockholders—get very little, if anything.

> "In the economist's language, this is the perfect case of a nonzero-sum game. In a classic zero-sum game, such as poker, the total winnings exactly equal the total losses; any gain is at another player's expense. But in the nonzero-sum game, both sides can improve their positions. In the case of the derivative action, this is achieved by settling the action for only cosmetic relief and then causing the corporation, not the individual defendant, to pay a substantial fee for the negligible benefit the plaintiff has secured for it. Typically, the corporation will then also indemnify the defendant for his own litigation expenses. In effect, the costs of the litigation are foisted upon the absent shareholders. Against this backdrop, it is little wonder that courts have come to doubt the social utility of private enforcement litigation when they see the majority of such cases ending not with the bang of victory or defeat, but only the whimper of dubious settlements." (footnotes omitted)

Coffee, *Rescuing the Private Attorney General*, 42 Md.L.Rev. at 243–45.

The court in its discretion rejects a lodestar approach for this case and, therefore, has not performed a lodestar analysis. The court will note, however, that a lodestar approach with a reduction for limited success would probably not be a great deal more. It has been noted that lodestar analyses in practice tend to result in a bottom line that approximates a fair percentage. *See* Coffee, *Understanding the Plaintiff's Attorney, supra* at 678–79 n. 26.

### B. Counsel for the Objectors.

█ Authority is sparse as to the manner of computing an attorney's fee award for objectors' counsel. Usually, if their efforts did not improve the terms of the settlement, they do not receive a fee. There is an exception, however, where their efforts have been of assistance to the court. That is the situation here.

When the settlement was first proposed, the court was struck by its minimal nature in contrast to plaintiffs' attorneys' initial optimistic view concerning the litigation's prospects. Frankly, the court was concerned that plaintiffs' attorneys had been worn out by the extended discovery or exhausted their resources, or both. That counsel for the objectors made a vigorous attack on the settlement and pursued extensive discovery, without being able to adduce any evidence of fraud or collusion or any reason for the modest settlement except that the evidence had not developed as plaintiffs' counsel had first anticipated, made the court much more comfortable in approving the settlement. Objectors' counsel ably performed the role of devil's advocate in this litigation and is deserving of a fee award for this service, even though the settlement was not improved. A fee award for this service is justified. *See Fisher v. Procter & Gamble Manufacturing Company,* 613 F.2d 527, 547 (5th Cir.1980); *Frankenstein v. McCrory Corporation,* 425 F.Supp. 762, 767 (S.D.N.Y.1977); *White v. Auerbach,* 500 F.2d 822, 828 (2nd Cir. 1974); *Whittemore v. Sun Oil Co.,* 58 F.R.D. 624, 627 (S.D.N.Y.1973). The court holds that a percentage basis is the most equitable way to reward counsel for the objectors as well.

Considering the above criteria, the court in the exercise of its discretion holds that the following award of fees is appropriate:

1. An award of attorney's fees to plaintiffs' attorneys as a group is hereby made in the amount of $400,000, being 40% of the $1,000,000 settlement fund;

2. An award of attorney's fees to counsel for the objectors is hereby made in the amount of $100,000, being 10% of the settlement fund;

These awards meet the criterion that the total attorney's fee award should not exceed 50% of the fund. The court believes very strongly that it would be grossly inequitable to the class if the fund were depleted more than 50%. Nevertheless, the court further believes that 50% is appropriate considering the complexity of the case and the efforts of counsel;

3. All attorneys shall pay their own expenses out of the above awards, the total award for combined fees and expenses being $500,000, 50% of the common fund obtained for the class in settlement;

4. The individual attorneys shall make every effort to reach an agreement as to how these awards shall be divided among themselves. The court recognizes, however, that the attorneys find themselves in a position analogous to a lifeboat full of castaways who have discovered a single can of Spam in the food locker. To avoid bloodshed and to discourage the revival of duels with deadly weapons, the court will assist counsel in dividing the fees if they are unable to agree within thirty (30) days. Therefore, they shall file a status report within that time as to their efforts to reach agreement.

### APPENDIX

### NOTICE OF PROPOSED SETTLEMENT OF A SHAREHOLDERS' DERIVATIVE ACTION AND OF A HEARING ON THE SETTLEMENT

To All Shareholders of Ashland Oil, Inc. of Record At the Close of Business on August 13, 1986:

A lawsuit pending in this Court, the United States District Court for the Eastern

District of Kentucky, involves claims brought on behalf of Ashland Oil, Inc. ("Ashland") by an Ashland shareholder, C.W. Howes, that various Ashland officers and directors during 1980 and 1981 made $44.3 million dollars in illegal and wasteful payments to foreign government officials, in order to influence Ashland's ability to acquire crude oil in the Mideast countries of Oman and Abu Dhabi.

The purpose of this Notice is to advise you about proposed settlements of that lawsuit that would affect your rights as a shareholder to file a suit for similar claims on behalf of Ashland. This Notice also describes a hearing that has been scheduled to consider arguments about whether the proposed settlements are fair, reasonable and adequate and should be approved by the Court.

### Description of The Howes Lawsuit

This lawsuit was filed on December 13, 1983, as a derivative action by shareholder C.W. Howes on behalf of Ashland. The original Complaint was amended twice, and the following discussion refers to the claims made in the Second Amended Complaint which was filed on September 24, 1984.

The *Howes* lawsuit was brought against these defendants: Orin E. Atkins, the former Chairman of Ashland's Board of Directors and Chief Executive Officer until September 1981; John R. Hall, since September 1981 the Chairman of the Board of Directors and Chief Executive Officer; William R. Seaton and Robert T. McCowan, the Vice Chairmen of the Board; Bill E. McKay, Jr., a former Ashland Vice President; Samuel C. Butler, Eugene W. Erickson, Robert D. Gordon, Jr., Walter W. Hillenmeyer, Jr., Dr. Grover E. Murray, Robert S. Reigeluth, F.H. Ross, Jr., James W. Vandeveer, Richard L. Terrell and Dr. Robert B. Stobaugh, who are members of the Board of Directors; Robert E. Yancey, Sr., former President of Ashland and a former member of the Board; and L. Edward Grubb, a former member of the Board.

The *Howes* lawsuit alleges that:

(a) In December 1980, Ashland at the direction of defendant Atkins paid $1.35 million to a foreign official with the expectation that he would use his influence to secure oil from the country of Oman;

(b) On approximately April 22, 1980, pursuant to authorization by the Board of Directors on January 30, 1980, Ashland acquired an interest in a chromium mining operation in Rhodesia (now Zimbabwe) by purchasing a 75 percent interest in the entity which owned the mining operation for approximately $25 million. At the time of the purchase, the defendants knew or should have known that the operation had relatively little value, and eventually the company lost all or substantially all of its investment. However, the defendants caused Ashland to make the payments for the sole or primary purpose of benefiting one or more foreign officials who were to use their influence to secure oil from the country of Oman;

(c) On approximately September 26, 1980, Ashland, through a subsidiary contracted to develop a Gore-Tex sausage casing process and invested $2.3 million of Ashland funds. At the time of the investment, the defendants knew or should have known that the process was untested and highly speculative, and eventually the company lost all of its investment. However, Ashland's payments resulted in funds being paid to a foreign official with the expectation that he would use his influence to secure oil from the country of Oman.

(d) During 1980 and 1981, Ashland made payments totaling approximately $17 million to a foreign official of the country of Abu Dhabi, with the expectation that the foreign official would use his influence to secure oil from Abu Dhabi.

Based on these allegations, the *Howes* lawsuit alleges that defendants violated the Foreign Corrupt Practices Act of 1977 and the Racketeer Influenced and Corrupt Organizations (RICO) statute, and committed waste and mismanagement of Ashland's funds. The lawsuit seeks judgment for $44.3 million for the allegedly illegal payments, plus interest at the legal rate; inter-

est at the legal rate for the five-month period in 1981 that the $1.35 million was allegedly held by a foreign official; RICO damages of three times the sum of $44.3 million plus interest on $1.35 million; and payment of plaintiff's attorneys' fees and costs.

### Terms of the Proposed Settlement

The plaintiff and all of the defendants except Bill E. McKay, Jr., entered into a settlement agreement on July 3, 1986 (the "Directors Settlement"). The plaintiff and defendant McKay entered into a separate settlement agreement on August 13, 1986 (the "McKay Settlement"). (The Directors Settlement and the McKay Settlement are sometimes collectively referred to below as "The Settlements"). Each of the defendants denies all liability and wrongdoing of that defendant and believes that at all times he acted in good faith and in the best interests of Ashland. Nevertheless, the plaintiff and the defendants have separately agreed to enter into The Settlements to put to rest all controversy and to avoid the expense, inconvenience and distraction of further time-consuming and protracted litigation. The Settlements are not to be construed as an admission of liability by any of the named defendants.

Similarly, plaintiff and his counsel have concluded, after taking into account the factual and legal issues involved, the uncertainties in establishing liability and in determining damages, the risks attending further prosecution and the benefits already received or to be received by Ashland as a result of The Settlements, that The Settlements are in the best interests of Ashland and its shareholders.

The Settlements are subject to approval by the Court and will not become final until no longer subject to appeal.

### I.

The terms, in substance, of the Directors Settlement, are as follows:

FIRST: All of the named defendants, except defendant McKay, will be dismissed with prejudice.

SECOND: The Home Insurance Company, which provides coverage for liability claims against Ashland's officers and directors, shall pay $3 million. This will be used to reimburse Ashland for $2 million in legal fees advanced by it and to pay up to $1 million for any fees and expenses established by the Court to be owing to plaintiff's counsel. (To the extent the Court awards plaintiff's counsel less than $1 million as an allowance of fees and expenses, Ashland will receive the difference between the fee award and $1 million.) Plaintiff's counsel have agreed not to seek an award from the Court greater than $1 million.

The settlement between the Home Insurance Company and Ashland with respect to this reimbursement to Ashland ends a dispute between them concerning amounts due Ashland as reimbursement and Ashland has agreed to indemnify The Home Insurance Company against further liability connected with this lawsuit, which could include defendant McKay's cross-claim described below.

THIRD: [A]ll of the named defendants, except defendants Atkins and McKay, shall cause Ashland to declare or implement the following:

(a) "The Office of the General Counsel of Ashland is a principal and vital part of Ashland. As such it has been and is expected to fulfill sensitive and important duties involving Ashland's business and affairs to insure that such matters are conducted lawfully and ethically. Its members must maintain independence consistent with applicable standards of professional responsibility so that advice given to Ashland's directors, officers and employees fulfills the high standards expected of the office of the General Counsel."

(b) "Ashland's General Counsel shall attend all meetings of the Board, shall periodically report to the Board as to the activities of the office of the General Counsel and shall be available to respond to inquiries directed by any member of the Board."

(c) "Ashland's General Counsel shall prepare procedures to be followed in the

future by which Ashland will investigate whether any foreign consultant could be determined to be a foreign official under the Foreign Corrupt Practices Act. The drafting of such procedures shall be completed by September 1, 1986, and such procedures shall thereafter be reviewed and approved by the Audit Committee of the Board subject to whatever changes such Committee may deem to be necessary or appropriate. Thereafter, such procedures as so approved shall be followed by Ashland."

(d) "Ashland's General Counsel shall continue to review all contracts with foreign consultants (as that term is presently defined in Ashland's policies) and shall report the status of all such contracts to the Audit Committee of the Board on a semi-annual basis."

(e) "Ashland shall adopt the following statement of corporate policy:

'All attorneys employed by Ashland Oil, Inc. shall have as their ultimate responsibility the rendering of legal services and advice for the benefit of Ashland Oil, Inc. or its subsidiary companies.' "

FOURTH: In consideration for his dismissal with prejudice, defendant Orin E. Atkins agreed to consent to the entry of a final order in an action begun on July 8, 1986 in the United States District Court for the District of Columbia by the Securities and Exchange Commission ("SEC") after a formal investigation that began in May 1983. In its complaint, the SEC alleged that defendant Atkins and Ashland violated the Foreign Corrupt Practices Act of 1977 ("FCPA") in connection with Ashland's purchase of a 75 percent interest in a Zimbabwean chromium mining operation (referred to earlier as one of plaintiff's allegations in this lawsuit). No other defendant in this lawsuit was named a defendant in the SEC action nor was any other former or present director, officer or employee of Ashland a defendant in that action. Without admitting or denying any allegations contained in the SEC's complaint, Ashland and defendant Atkins each consented to the entry of final orders by the D.C. Court enjoining them from any future violations of the FCPA. Defendant Atkins will release Ashland from any obligation to indemnify or reimburse Atkins for any future loss or expense he may have incurred or could incur by reason of this action.

## II.

The terms, in substance, of the McKay Settlement, are as follows:

FIRST: Defendant McKay will be dismissed with prejudice.

SECOND: The Settlements shall not preclude defendant McKay from asserting any claim or cause of action that he might have by way of cross-claim in this lawsuit. McKay acknowledged that plaintiff Howes could not bind Ashland or any of the other settling defendants by plaintiff's execution of the McKay Settlement.

THIRD: Defendant McKay has also filed a separate lawsuit against Ashland and defendant Atkins that has been consolidated during pre-trial proceedings with the *Howes* lawsuit. This suit includes most of the allegations contained in the *Howes* lawsuit, and The Settlements will not affect the ability of McKay to pursue his individual claims and will not preclude any party from asserting any claims or defenses in that separate lawsuit.

### Additional Information

A third lawsuit involving claims by another former Ashland Vice President, Harry D. Williams, against *Howes* defendants Ashland, John Hall and Robert McCowan, among others, has also been filed and consolidated during pre-trial proceedings with the *Howes* lawsuit. Harry Williams was previously a plaintiff in this lawsuit, but was dismissed by the Court because of his separate lawsuit. This suit includes most of the allegations contained in the *Howes* lawsuit, and The Settlements will not affect the ability of Williams to pursue his individual claims and will not preclude any party from asserting any claims or defenses in that separate lawsuit.

### Settlement Hearing

The Court will hold a hearing in the Courtroom on the second floor of the Unit-

ed States Post Office and Courthouse Building, 7th and Scott Streets, Covington, Kentucky, at 9:30 a.m. on November 14, 1986, to receive evidence and hear arguments about whether The Settlements should be approved. If The Settlements are approved, the Court will also receive evidence and hear arguments about whether to award fees and expenses to plaintiff's attorneys. If The Settlements are not approved, the case may continue to be prepared for trial or other judicial resolution of the plaintiff's claims, McKay's cross-claim, and the defendants' defenses.

Shareholders who support The Settlements do not need to appear at the hearing or take any other action to indicate their approval. Shareholders who object to The Settlements may appear at the hearing, and shall no later than 20 days before the hearing, file with the Court written notice of the shareholder's intention to appear, together with a statement of the shareholder's comments about any matter before the Court and the basis for the comments.

A copy of The Settlements may be obtained from one of plaintiff's attorneys, Ron Parry, of the law firm ROBINSON, ARNZEN, PARRY & WENTZ, P.S.C., 600 Greenup Street, P.O. Box 472, Covington, Kentucky 41012–0472, or JOHN P. WARD, Secretary, Ashland Oil, Inc., P.O. Box 391, Ashland, Kentucky 41114. Copies of all papers filed with the Court, including The Settlements, may be examined during regular business hours (1) at the office of the Clerk of the United States District Court in the United States Post Office and Courthouse Building, Second Floor, 7th and Scott Streets, Covington, Kentucky 41012; or (2) at the offices of STITES & HARBISON, counsel to Ashland, 101 East Vine Street, Lexington, Kentucky 40507.

Copies of all deposition transcripts or documents produced during discovery may be examined by shareholders or their designated representatives during regular business hours at the offices of STITES & HARBISON, 101 East Vine Street, Lexington, Kentucky 40507. Additional documents may be located at the offices of John R. McCall of BROWN, TODD &

HEYBURN, counsel for Bill E. McKay, Jr., 1600 Citizens Plaza, Louisville, Kentucky 40202. Prior to examining these documents and depositions, all persons will be required to agree in writing to comply with orders of the Court concerning the documents and transcripts.

**REMINDER AS TO TIME LIMITS**

Any questions you have concerning the matters in this Notice should not be directed to the Court but may be directed to one of plaintiff's attorneys, Ron Parry, by telephone at (606) 431–6100 or by letter at the address noted above. If you wish to object to the proposed settlements, you must file your written objection with the Clerk of the Court by mail postmarked before October 26, 1986. You must also include any request to be heard orally at the hearing.

Dated: August 15, 1986
/s/ Mary H. Yelton
Mary Yelton, Deputy Clerk
United States District Court
Eastern District of Kentucky