**Marta A. SALA, on behalf of herself and all others similarly situated**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a "Amtrak".**

Civ. A. No. 88–1572.

United States District Court,
E.D. Pennsylvania.

Sept. 27, 1989.

Allen D. Black, Philadelphia, Pa., for plaintiff.

Richard L. Goerwitz, Jr., Philadelphia, Pa., for defendant.

### MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

#### I.

Plaintiff Marta Sala has moved for final approval of a proposed settlement of this class action in mass tort, which was filed on behalf of all passengers injured in a train derailment near Chester, Pennsylvania. The proffered settlement provides that defendant National Railroad Passenger Corporation, which is more commonly known as Amtrak, shall pay the class $1,750,000, plus any interest that accrues between the signing of the settlement agreement and final distribution to the class. Pursuant to the proposed settlement, Amtrak has delivered a check for $1,750,000 to the law firm of Williams & Connolly, acting as escrow agent, which has invested the funds in government securities.

This litigation arose out of a collision between Amtrak Train No. 66 ("The Night Owl") and a 17–ton piece of track equipment near Chester, Pennsylvania in the early morning hours of January 29, 1988. The Boston-bound train was carrying some 140 passengers and 10 crew members at the time.

The accident occurred north of Hook Interlocking, an area in which trains may cross from one track to another by means of switches. Two and one-half hours before The Night Owl was to pass through Hook Interlocking, track 2 north of Hook was closed so that a maintenance crew could service it. When The Night Owl approached Hook Interlocking on track 2, Tom Connor, the tower operator on duty who had control of the switches and signal levers, failed to divert the train from track 2 to track 1 and to set the safety signals properly. As a result, the train proceeded up track 2 at its maximum authorized speed of ninety miles per hour and collided with the maintenance equipment. Upon impact, The Night Owl's two engines and eight cars derailed, injuring an estimated forty to fifty passengers. Fortunately, no one was killed.

Tom Connor immediately fled the scene of the wreck. He was not located until three days later, at which time he was interrogated and tested for drug use. Toxicological tests disclosed the presence of marijuana, amphetamines, methamphet-

amines, and cocaine in Mr. Connor's system.

Marta Sala, a passenger on The Night Owl, commenced this action against Amtrak on February 25, 1988. Her complaint, filed on behalf of herself and all other passengers injured in the accident, sought compensatory and punitive damages for alleged negligence and willful misconduct on the part of Amtrak. This Court granted class certification pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on April 29, 1988. *Sala v. National Railroad Passenger Corp.*, 120 F.R.D. 494 (E.D.Pa. 1988) (Broderick, J.).

Although there has been hesitation in the past to permit suits involving mass torts to proceed as class actions, *see id.* at 495–97, in the Court's opinion it has been an effective and efficient litigation vehicle for both the Court and the parties. Absent certification, some fifty individuals would have filed fifty separate lawsuits in various courts in which service could be obtained upon the defendant. Doubtless, the overall combined costs to the parties and to society in resolving these myriad suits would have been much greater than the expense required to maintain this class action. Almost all the potential litigation stemming from The Night Owl wreck has been brought to a just conclusion less than two years after the accident. The class action thus has proved a worthy mechanism to adjudicate disputes arising out of mass torts.

After class certification, plaintiff embarked on extensive discovery, which lasted for over a year. Because Amtrak already had admitted negligence, but denied that it had engaged in reckless and outrageous conduct warranting punitive damages, plaintiff reviewed thousands of documents and deposed twenty-seven witnesses in the effort to unearth evidence of Amtrak's alleged willful wrongdoing. Plaintiff interviewed all significant Amtrak personnel involved in the accident, including Amtrak managers in charge of safety and Mr. Connor's supervisors.

Plaintiff also retained four expert witnesses. Three of these experts, each conversant in psychiatry, toxicology, or substance abuse, were prepared to testify that Mr. Connor likely was under the influence of drugs at the time of the collision [1] and that Mr. Connor likely had a chronic substance abuse problem which his supervisors should have identified by reason of his erratic work attendance. Mr. Connor's supervisors acknowledged in deposition testimony that his work record was indicative of possible drug abuse, yet they had failed to follow through on warnings that he would be fired if his absences continued, to recommend that he seek counselling, or to transfer him to a less safety-dependent position.

A fourth expert was prepared to testify that Amtrak was reckless in its failure to protect adequately against collisions on out-of-service tracks. Plaintiff further believed that she had developed documentary and testimonial evidence indicating that Amtrak had discontinued an effective anti-collision procedure known as "fuse pulling" without engaging in a sufficiently prudent safety analysis. She also secured evidence of numerous safety rule violations by Amtrak employees, of ten prior incidents in which these violations had allowed trains to travel on out-of-service tracks, and of governmental criticism regarding Amtrak's failure to ensure compliance with safety regulations. These facts, plaintiff contended, placed Amtrak on notice that its anti-collision system was inadequate.

Plaintiff also contacted potential class members and obtained information concerning their injuries and losses. She mailed both a court-approved class notice and an injury questionnaire to all 146 persons named on Amtrak's passenger list. Of these mailings, 130 were delivered, with twenty-five passengers eventually opting out of the class. Plaintiff contacted another six class members through subsequent

**1.** One fact upon which plaintiff relied to reach this conclusion was Mr. Connor's invocation of the fifth amendment guarantee against self-incrimination when he was asked at his deposition whether he had been under the influence of drugs at the time of the accident.

efforts, which included the use of a private investigator. Forty-one class members reported specific injuries. Plaintiff's counsel then interviewed class members, either in person or by telephone,[2] to document more detailed information about their claims.

Although some passengers on The Night Owl suffered concussions and one lost several teeth, most of those who became class members sustained "soft tissue" injuries, such as bruises, strains, and stiffness. As a whole, twenty-one class members received medical attention, with only seven apparently generating over $1,000 in expenses. The total cost of class members' medical treatment is probably less than $50,000. Eleven class members missed some work, three of whom were absent for more than two weeks. Fourteen report continuing physical trauma, all of which involve soft-tissue soreness or limitation of motion and many of which are temporarily recurring.[3]

Class members also reported either temporary or enduring emotional injury. The most common psychological difficulty experienced was a fear of travel, which has hampered a few class members from properly fulfilling their job responsibilities. The class members further indicated that their injuries resulted in various degrees of pain and suffering.

On April 21, 1989, the Court ordered that the pending trial, which was to begin on June 26, be bifurcated and that plaintiff's punitive damage claims be considered first. Seeking dismissal of plaintiff's punitive damages claims, Amtrak then filed a motion for partial summary judgment, which the Court denied on June 14. On June 19, the parties submitted a detailed pre-trial order and during the week before trial plaintiff filed six motions *in limine*. On the last business day before trial, following one month of intermittent negotiations, the parties agreed to a settlement and postponed the trial with leave of the Court pending its approval of the proposed settlement.

## II.

The standards that this Court must apply to determine whether to approve a proposed class action settlement are well established. The Court, in its sound discretion, *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir.1971), must find whether the proposed settlement is "fair, adequate, and reasonable." *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983). The Third Circuit has articulated several factors to guide the district court's inquiry:

(1) [T]he complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)). The Court, having considered the *Girsh* factors, finds that the proposed settlement

---

**2.** Class members are widely dispersed geographically. Few reside in the Philadelphia area. Many live in New York City or Washington, D.C., and some live as far away as California, Montana, Oregon, West Germany, and Sweden.

**3.** One of the most seriously injured class members is a sixty-four year old New York woman who was knocked unconscious during the collision. She suffered severe bruising and swelling of the neck, shoulder, back, left knee and right wrist, for which she continues to receive treatment. She was unable to attend work for approximately one and a half months and still occasionally misses work days. In addition, this class member has endured serious emotional harm: she is depressed and fears both travel and crowds.

Another seriously injured class member was one year old at the time of the accident. The collision rendered her unconscious for more than an hour. Before the wreck the infant was walking, but afterward she was unable to do so for three months. She almost certainly has lasting injuries, although they are difficult to quantify.

agreement in this action is fair, adequate, and reasonable.

First, further litigation in this case clearly would present issues that would be costly to resolve and that could result in protracted proceedings. Most of the evidence upon which plaintiff intended to rely to prove the outrageous conduct necessary to recover punitive damages was circumstantial and accretive. Moreover, the case would have involved difficult questions of admissibility of this evidence. For example, to establish that Tom Connor was under the influence of intoxicants on the morning of the accident, plaintiff would have relied on occurrence witnesses, the positive drug test conducted three and one-half days after the wreck, Mr. Connor's poor work attendance record, his flight from the scene, and his invocation of the fifth amendment. The last fact in particular raises delicate issues of probity and unfair prejudice. *See* Fed.R.Evid. 403. Plaintiff also would have utilized, at considerable expense, expert witnesses to show that the combination of drugs found in Mr. Connor indicated that he was a habitual drug user, which, plaintiff believed, tended to demonstrate that Mr. Connor was under the influence of drugs at the time of the collision.

Further, to establish recklessness plaintiff planned to introduce evidence of prior intrusions by Amtrak trains onto out-of-service tracks and of Amtrak accidents at Edison, New Jersey and Chase, Maryland. These events, plaintiff asserted, indicate that Amtrak was on notice that its switching procedures were inadequate and that suspicious employee work and driving records, like those of Mr. Connor's, were indicative of possible drug abuse. Obviously, proof or disproof of these occurrences implicates complex evidentiary issues and entails the introduction of numerous witnesses and documents.

Even more expensive and protracted would have been the task of developing and trying the damages phase of the case. Each of the forty-one class members would have been subject to a possible deposition. Some or all may have been required to travel the potentially considerable distance to Philadelphia and present medical testimony. Friends and relatives may have been called to corroborate their injuries.

Second, the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy. The Court ordered notices be served on all class members, and none have lodged objections to the settlement with counsel for either party or with the Court. The utter absence of objections from the class itself militates strongly in favor of approval of the settlement.

Third, although the proceedings are relatively advanced, enough so that the parties are fully cognizant of the issues and risk involved in further litigation, and discovery has been completed, a settlement at this time would represent significant savings of trial and appeals costs.

The fourth and fifth *Girsh* factors—the risks of establishing liability and damages—are considerable for both plaintiff and defendant. As discussed earlier, much of plaintiff's proof of willful misconduct was vulnerable to exclusion on Rule 403 grounds. Judicial resolution of these matters would have affected tremendously the viability of both parties' cases.

We note initially that punitive damages are not a favorite of the law, *Cochetti v. Desmond*, 572 F.2d 102, 105 (3d Cir.1978), and that large punitive damage awards are not common. In this case, given that Amtrak is not a profitable company, but receives an annual government subsidy of some $600 million, that after The Night Owl accident Amtrak instituted a variety of backup safety systems, and that the passengers' physical injuries on the whole were not egregious, a jury may well have found little reason to punish the company or attempt to deter any future misconduct on its part by means of a large punitive damages award.

Additionally, the bulk of damages sought here is inherently speculative. Many class members suffered only a small amount of

medical and other out-of-pocket expenses.[4] Almost all requested damages were for pain and suffering and emotional injury. As such, because their valuation is entrusted primarily to the jury's discretion, these claims for substantial compensatory damages involved a high degree of risk. For that same reason the defendant's exposure was considerable.

Sixth, although the danger of class decertification at trial appears minimal, as noted above, the class members would have assumed a significant risk that classwide relief might not be available, and defendant would have faced the possibility of substantial damages.

Seventh, the Court has considered defendant's ability to withstand a greater judgment. There is no evidence in the record before the Court that Amtrak would be unable to satisfy a larger damages award. The short history of Amtrak, however, reveals that it has not been a profit-making enterprise, and its continuance has depended on government subsidies. The proposed settlement would obviate the risks associated with class members obtaining an even more sizeable award against defendant and thereafter discovering that it could not satisfy the judgment.

Last, the Court has evaluated the range of reasonableness of the settlement in light of all the risks associated with litigation. Plaintiff's reliance on circumstantial and accretive evidence of Amtrak's putative willful misconduct and the speculative nature of damages based on emotional distress and pain and suffering place severe obstacles to proving both liability and damages. Although an award in excess of the settlement value might be a possibility at trial, the settlement is well within the range of reasonableness identified by the Third Circuit in *Girsh*. It is also significant that neither counsel nor the Court has heard any objection to the proposed settlement, although members of the class received formal notice of its terms. The

Court, therefore, finds that the relative considerations weigh in favor of the proposed settlement and that the proposed settlement is fair, adequate, and reasonable.

**4.** Indeed, this fact influenced the Court's decision to grant class certification. Absent a class action mechanism, those passengers who incurred minimal actual losses effectively would have lacked legal recourse to vindicate their claims. *Sala,* 120 F.R.D. at 500; *see also Roper v. Consurve, Inc.,* 578 F.2d 1106, 1114 (5th Cir. 1978), *aff'd,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427, *reh'g denied,* 446 U.S. 947, 100 S.Ct. 2177, 64 L.Ed.2d 804 (1980).