Marta A. **SALA**, on behalf of herself and all others similarly situated

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a "Amtrak".**

**Civ. A. No. 88–1572.**

United States District Court, E.D. Pennsylvania.

Nov. 13, 1989.

---

Allen D. Black, Philadelphia, Pa., for plaintiff.

Richard L. Goerwitz, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this class action in mass tort, plaintiffs' legal counsel, Fine, Kaplan and Black of Philadelphia and Williams & Connolly of Washington, D.C., have produced a settlement valued approximately at $1.79 million, including accrued interest. Counsel now moves jointly for an award of attorneys' fees amounting to one-third of the settlement fund, in addition to costs of $97,-538.56.

### I.

The underlying litigation arose out of a collision between Amtrak Train No. 66 (The Night Owl) and a 17–ton piece of track equipment during the early morning hours of January 29, 1988. The accident occurred near Hook Interlocking, an area in which trains may cross from one track to another by means of switches. Two and one-half hours before The Night Owl was to pass through Hook Interlocking, track 2 was closed to the north so that a maintenance crew could service it. When The Night Owl approached Hook Interlocking on track 2, Tom Connor, the tower operator on duty who possessed control of the switches and signal levers, failed to divert the train from track 2 to track 1 and to set the safety signals properly. The train thus proceeded up track 2 at its maximum au-

thorized speed of ninety miles per hour and collided with the maintenance equipment. Upon impact, The Night Owl's two engines and eight cars derailed, injuring an estimated forty to fifty passengers. Fortunately, no one was killed.

Tom Connor immediately fled the scene of the wreck. He was not located until three days later, at which time he was interrogated and tested for drug use. Toxicological tests disclosed the presence of marijuana, amphetamines, methamphetamines, and cocaine in Mr. Connor's system.

Although some passengers on The Night Owl suffered concussions and one lost several teeth, most of those who eventually became class members sustained "soft tissue" injuries, such as bruises, strains, and stiffness. Twenty-one class members received medical attention, and eleven missed some work. Plaintiffs also later reported either temporary or enduring emotional injury and various degrees of pain and suffering. The most common psychological malady experienced was a fear of travel, which has hampered a few class members from properly fulfilling job responsibilities.

Marta Sala commenced this action against Amtrak on February 25, 1988. Her complaint, filed on behalf of herself and all other passengers injured in the accident, sought compensatory and punitive damages against Amtrak for alleged negligence and willful misconduct. This Court granted class certification pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on April 29, 1988. *Sala v. National Railroad Passenger Corp.*, 120 F.R.D. 494 (E.D.Pa.1988). Seeking dismissal of plaintiffs' punitive damages claims, Amtrak then filed a motion for partial summary judgment, which the Court denied on June 14, 1989. The parties submitted a detailed pre-trial order on June 19, and plaintiffs filed six motions *in limine*. On the last business day before trial, scheduled for June 26, the parties agreed to a settlement, which the Court later approved. *Sala v. National Railroad Passenger Corp.*, 721 F.Supp. 80 (E.D.Pa.1989).

## II.

The Supreme Court has recognized that a "litigant who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *see also Alyeska Pipeline Serv. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 393, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 532–37, 26 L.Ed. 1157 (1882). This common fund doctrine rests on the perception that individuals who profit from a lawsuit "without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing Co.*, 444 U.S. at 478, 100 S.Ct. at 749. To prevent this inequitable result, a court may assess fees against the entire fund and thereby spread litigation costs proportionately among those whom the suit benefits. *Id.* Similarly, the Third Circuit has noted that in the class action context, attorneys who create a settlement fund are entitled to recover fees against that fund. "The award of fees under the equitable fund doctrine is analogous to an action in quantum meruit; the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed." *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp. (Lindy I)*, 487 F.2d 161, 165 (3d Cir.1973); *see also Silberman v. Bogle*, 683 F.2d 62, 64 (3d Cir.1982); *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp. (Lindy II)*, 540 F.2d 102, 110 (3d Cir.1976).

Although it is well established that attorneys' fees may be drawn from a fund in court, there is some controversy regarding the proper method by which the amount of compensation should be calculated. Until 1973, the size of the fee award in both common fund cases and statutory fee shifting cases was left to the court's discretion. "Awards often reflected what the court

believed was a 'reasonable percentage' of the amount recovered." *Court Awarded Attorney Fees: Report of the Third Circuit Task Force* (1985), *reprinted in* 108 F.R.D. 237, 242 [hereinafter *Task Force Report*]. Although judges at that time utilized a multitude of factors in establishing amounts for fee awards, they relied most heavily on "the size of the fund or the amount of benefit produced for the class." *Id.* Yet, given the open-ended and contextual nature of the reasonable percentage standard, it often was maligned as investing unlimited discretion in trial judges, producing inconsistent results, and authorizing the collection of windfall profits by attorneys. *Task Force Report,* 108 F.R.D. at 242 (remarking award percentages varied "considerably from case to case"); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I),* 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986); Coffee, *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working,* 42 Md.L.Rev. 215, 241–43 (1983); Note, *Determining the Reasonableness of Attorneys' Fees—The Discoverability of Billing Records,* 64 B.U.L. Rev. 241, 243–44 (1984).

Responding to these criticisms, the Third Circuit, in *Lindy I* and *Lindy II,* developed the lodestar method of setting fees. This approach is composed of two steps. First, to determine the "lodestar," the court multiplies the hours spent on the case by a reasonable hourly rate of compensation for each attorney involved. Second, the court adjusts that figure to reflect the contingent nature of the litigation and the quality of the attorney's work. *In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 583–84 (3d Cir.1984); *Lindy II,* 540 F.2d at 113, 117–18; *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 168 (3d Cir.1975); *Lindy I,* 487 F.2d at 167–68. The Supreme Court, however, reasoning that the latter step is largely subsumed within the former, has curtailed the availability of contingency and quality enhancements to the lodestar. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley II),* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098; *see also Blum v. Witco Chem. Corp.,* 829 F.2d 367, 380 (3d Cir.1987).

With the advent of *Lindy,* courts soon began applying the lodestar formulation to both equitable fund and statutory fee cases "without any real analysis of the propriety of doing so," *Task Force Report,* 108 F.R.D. at 251; *see also Fine Paper,* 751 F.2d at 583 n. 19, and even though the "public policy considerations in the two situations are not obviously identical." *Id.* In particular, "rather than being based on the- equitable notion that those who have benefited from litigation should share its costs," *Task Force Report,* 108 F.R.D. at 250, fee shifting provisions were intended to encourage the private enforcement of those substantive rights that " 'Congress considered of the highest importance.' " H.R.Rep. No. 94–1558, at 2 (1976) (quoting *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). But because civil rights claims often produce only nominal damages or else declarations of rights, which do not translate easily into pecuniary terms, *id.* at 9; *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978); *Task Force Report,* 108 F.R.D. at 250, fee awards reflecting the reasonable number of hours expended, instead of the amount of money recovered, were thought necessary to induce competent counsel to undertake representation of civil rights plaintiffs. *See e.g., City of Riverside v. Rivera,* 477 U.S. 561, 577, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466 (1986) (plurality opinion) ("[T]he contingent fee arrangements that make legal services available to many victims of personal injuries would often not encourage lawyers to accept civil rights cases, which frequently involve substantial expenditures of time and effort but produce only small monetary recoveries."); *id.* at 586, 106 S.Ct. at 2700 (Powell, J., concurring); *id.* at 595, 106 S.Ct. at 2704–05 (Rehnquist, J., dissenting); *Kerr v. Quinn,* 692 F.2d 875, 877 (2d Cir.1982). In contrast, the minimum compensation guaranteed to prevailing plaintiffs' attorneys by

the *Lindy* approach is not needed "in the traditional fund case or in those statutory fee cases likely to produce a sizeable fund from which counsel fees could be paid." *Task Force Report,* 108 F.R.D. at 251. *See generally id.* at 250–51, 254–55 (identifying other differences between typical fund-in-court and fee shifting situations). Of course, this Court does not presume to criticize *Lindy* and its progeny. Rather, like the Task Force, it perceives merely that applying variant fee recovery methods to these two categories of actions will best achieve the differing policy objectives each was designed to further. *Task Force Report,* 108 F.R.D. at 250–55.

■ Moreover, the Supreme Court not only has distinguished between fund-in-court and statutory fee cases, it also has recognized the propriety of employing the percentage of recovery method in the common fund context. "Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under [fee shifting statutes] reflects the amount of attorney time reasonably expended on the litigation." *Blum v. Stenson,* 465 U.S. 886, 901 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984); *accord* 3 H. Newberg, *Newberg on Class Actions* 186 (2d ed.1985); *see also Rivera,* 477 U.S. at 574, 106 S.Ct. at 2694 (plurality opinion); *id.,* at 586, 106 S.Ct. at 2700 (Powell, J., concurring in judgment); *id.* at 595, 106 S.Ct. at 2704–05 (Rehnquist, J., dissenting). In the wake of *Blum,* several courts have held that the percentage of recovery method is an acceptable basis upon which to calculate fee awards. *See Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 271 (9th Cir.1989) (approving Task Force recommendation that fees be awarded on percentage basis in common fund cases); *Brown v. Phillips Petroleum,* 838 F.2d 451, 454 (10th Cir.) (holding award of fees on percentage basis in equitable fund case not per se abuse of discretion), *cert. denied,* — U.S. —, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Bebchick v. Washington Metro. Area Transit,* 805 F.2d 396, 406 (D.C.Cir.1986) (holding in fund-in-court cases reasonable fee based on percentage

of fund bestowed on class); *In re TSO Financial Litigation,* No. 87–7903, slip op. 1989 WL 80316 (E.D.Pa. July 17, 1989) (awarding percentage of recovery fee in equitable fund case); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679 (M.D. Ala.1988); *Howes v. Atkins,* 668 F.Supp. 1021, 1024 (E.D.Ky.1987) (stating "lodestar analysis is usually inappropriate" in common fund context); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735 (S.D.N.Y.1985); *Phemister v. Harcourt Brace Jovanovich, Inc.,* 1984–2 Trade Cases (CCH) ¶ 66,234 (N.D.Ill.1984); *see also Task Force Report,* 108 F.R.D. at 255; Coffee, *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions,* 86 Colum.L.Rev. 669, 724–25 (1986); Coffee, *supra,* 42 Md.L.Rev. 266–68, 285–88. The Court therefore concludes that in equitable fund situations it typically should employ a percentage of recovery approach in setting attorneys' fees. As there are no circumstances suggesting its application would be unjust, the Court will employ the percentage method in this case.

### III.

■ Because the instant suit involves a straightforward common fund, certain principles guide our disposition of plaintiffs' motion. First, the district court retains discretion to calculate the fee. *Task Force Report,* 108 F.R.D. at 256. Courts have allowed attorney compensation ranging from 19 to 45% of the settlement fund created, *see TSO Financial Litigation,* slip op. at 14 & appendix, and one Circuit panel has concluded that the appropriate benchmark percentage for fee awards is 25%. *Graulty,* 886 F.2d at 271; *see also* 3 H. Newberg, *supra,* at 190 (stating normal range of common fee awards is between 20 and 30%); Coffee, *supra,* 42 Md.L.Rev. at 239 (indicating typical award between 20 and 35% of fund). In general, the percentage of recovery fee should "decrease as the size of the fund increases." *Task Force Report,* 108 F.R.D. at 256; *see also* 3 H. Newberg, *supra,* at 190; Hornstein, *Legal*

*Therapeutics: The "Salvage" Factor in Counsel Fee Awards,* 69 Harv.L.Rev. 658, 664 (1956). Second, because of "the potential for conflict of interest between the attorneys seeking compensation and the clients" in the equitable fund context, "the trial court has an independent duty to scrutinize fee applications." *Cunningham v. City of McKeesport,* 753 F.2d 262, 267 (3d Cir.1985), *vacated,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986), *reinstated,* 807 F.2d 49 (3d Cir.1986), *cert. denied,* 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987); *see also In re Fine Paper Antitrust Litigation,* 840 F.2d 188, 195–96 (3rd Cir.1988) (citing *Fine Paper,* 751 F.2d at 583). The Court does note, however, that no class members have registered exceptions to counsel's request for fees comprising one-third of the settlement fund or to the proposed reimbursement for expenses.

■ The Court has examined both the fee petition submitted by plaintiffs' counsel and the entire record of this litigation. Based on that review, we conclude that the class was well served by experienced counsel who effectively prosecuted a case that presented vexing factual, legal, and logistical difficulties, but who nonetheless obtained a highly favorable recovery. *Sala,* 721 F.Supp. at 84.

[6] Petitioners also brought this action to a close only sixteen months after filing the complaint, despite the problems with which they contended. This is precisely the sort of result that the percentage of recovery fee method is intended to foster and stands as a counterexample to complaints about the slow pace of complex litigation. Moreover, plaintiffs' counsel terminated this controversy by settlement and thereby avoided burdening the federal judicial system with a trial and appeals. Because "a prompt and efficient attorney who achieves a fair settlement without litigation serves both his client and the interests of justice," *McKenzie Constr. Co. v. Maynard,* 758 F.2d 97, 101–02 (3d Cir. 1985), courts and legal commentators sensibly have rejected the view that early settlement necessarily should reduce the amount of the fee award. *See, e.g., Prandini v.*

*National Tea Co.,* 557 F.2d 1015, 1019–20 (3d Cir.1977); *Dorfman v. First Boston Corp.,* 70 F.R.D. 366, 385 (E.D.Pa.1976); *Blank v. Talley Indust.,* 390 F.Supp. 1, 5–6 (S.D.N.Y.1975); Hornstein, *supra,* 69 Harv. L.Rev. at 660–61. Indeed, this Court has stated that "it would be the height of folly to penalize an efficient attorney for settling a case on the ground that less total hours were expended in the litigation." *TSO Financial Litigation,* slip op. at 13.

The Court also finds, however, that the percentage of recovery fee should decrease as the size of the common fund increases. The employment of a sliding scale not only was recommended by the Third Circuit Task Force, 108 F.R.D. at 256, but also is implicit in the Court's *TSO Financial Litigation* fee award and in many of the cases surveyed in that decision. *See generally* 3 H. Newberg, *supra,* at 190; Hornstein, *supra,* 69 Harv.L.Rev. at 658. For example, in situations involving funds comparable in magnitude to the one extracted here, courts have awarded percentage of recovery fees comprising 25 to 30% of the fund. *See, e.g., In re GNC Shareholder Litigation,* 668 F.Supp. 450 (W.D.Pa.1987) (25% fee from recovery of $2.025 million); *Seiffer v. Topsy's Int'l,* 70 F.R.D. 622 (D.Kan. 1976) (30% fee from recovery of $1.42 million); *Colonial Realty v. Baldwin–Montrose Chem.,* No. 68–991, slip op. (E.D.Pa. Apr. 18, 1972) (25% fee from recovery of $1.5 million); *Schlusselberg v. Keystone Custodial Funds, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 93,901, 1973 WL 375 (S.D.N.Y. 1973) (27% fee from recovery of $1.750 million). Recognition of this general inverse relationship between fund and fee—in conjunction with a healthy acknowledgment that the setting of attorney compensation will never be an exact science and that the percentage of recovery fee approach is extremely particularistic—assists in explaining the facially disparate award percentages that some critics have identified in equitable fund cases. *See* Hornstein, *supra,* 69 Harv.L.Rev. at 664, 681.

In light of the foregoing, the Court will grant to the applicants jointly attorneys' fees in the amount of $570,333.00, which

constitutes 33% of the first million dollars in settlement plus 30% of the remainder between one and two million dollars, or slightly less than 32% of the total fund of $1,790,000.

We note at least one commentator has suggested that in order to avoid allowing the kind of windfall fee awards which depressed support for the percentage of recovery method in the first place, courts should compare the level of compensation to be granted under the percentage approach with that which the lodestar time formula would produce. *See* Coffee, *supra*, 42 Md.L.Rev. at 268. In this case, either approach yields substantially the same award. Counsel for the class documented a collective expenditure of over 3500 attorney and paralegal hours during the course of this action. According to their petition and affidavits, application of the *Lindy* method would produce an unenhanced attorneys' fee of $545,224.58. Joint Petition for Fees at 21. Although it is most doubtful that plaintiffs' attorneys have met the heavy burden required to support a quality or contingency enhancement of that figure, *see, e.g., Blum v. Witco Chem. Corp.*, 888 F.2d 975 (3d Cir. 1989), they would be entitled to an upward adjustment of the lodestar for some sixteen months of delay in payment. *See Missouri v. Jenkins,* — U.S. —, 109 S.Ct. 2463, 2468–69, 105 L.Ed.2d 229 (1989). Even a modest delay enhancement would render the lodestar product essentially identical in size to the one permitted today under the reasonable percentage approach.

### IV.

 Plaintiffs' counsel also has moved the Court to award them $97,538.56 for aggregate costs incurred between inception of the lawsuit and September 1, 1989. A significant portion of that sum was disbursed to expert witnesses, an expense that clearly is compensable even though the action settled, since their testimony would have been indispensable to plaintiffs' case had it proceeded to trial. *See, e.g., Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201, 205–06 (3d Cir.1981). After reviewing the law firms' supporting records

and affidavits, the Court finds that the amounts are adequately documented, proper, and reasonable. Accordingly, the Court will allow these expenses to be paid from the common fund.

### ORDER

AND NOW, this 13th day of November, 1989, for the reasons set forth in this Court's Memorandum of November 13, 1989,

IT IS ORDERED that plaintiffs' counsel are jointly awarded $570,333.00 in attorneys' fees and $97,538.56 in costs, for a total award of $667,871.56, to be paid from the common fund established pursuant to the Settlement Agreement approved by this Court on September 27, 1989.