In re COPLEY PHARMACEUTICAL, INC., "Albuterol" Products Liability Litigation.

MDL No. 1013.

United States District Court, D. Wyoming.

April 30, 1998.

■■■■■■■■■■■■■■■■■■■■■■■■

Stanley M. Chesley, Janet G. Abaray, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, Michael R. O'Donnell, Burke, Woodard & O'Donnell, Cheyenne, WY, for Plaintiffs.

Sheila L. Birnbaum, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendant.

### ORDER ON JOINT PETITION OF CLASS COUNSEL AND PLAINTIFFS' STEERING COMMITTEE FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

BRIMMER, District Judge.

This matter came before the Court upon the Joint Petition of Class Counsel and Plaintiffs' Steering Committee seeking an award of attorneys' fees and expenses from the common fund created by the settlement of this action. The Court, having heard oral argument, having reviewed the materials on file, and being fully advised in the premises herein, hereby FINDS and ORDERS as follows:

#### Background

The Court has provided a more detailed history of this action in its prior orders. *See In re Copley Pharmaceutical, Inc.*, 161 F.R.D. 456 (D.Wyo.1995); *In re Copley Pharmaceutical, Inc.*, 158 F.R.D. 485 (D.Wyo.1994); Order Approving Settlement, November 15, 1995. Suffice it to say that this action arose out of the contamination with pseudomonas fluorescens of four batches of Albuterol manufactured by Defendant Copley Pharmaceutical, Inc. Individuals believing that this organism, or other contaminants in Defendant's products, caused injuries to themselves or others brought suit in state and federal courts throughout the country. Defendant removed those actions that it could to federal court, and eventually sought relief from the Judicial Panel for Multi–District Litigation. On June 7, 1994, the MDL Panel consolidated all federal cases against Defendant before this Court.

Following certification as a class action and appointment of class counsel, this action moved forward with surprising speed and efficiency. During expedited discovery, class counsel reviewed and analyzed more than 125,000 pages of documents and deposed roughly one hundred witnesses. One year and seven days after consolidation before this Court, trial commenced. And after 42 days of trial, in which each side presented an impressive case, the parties entered into a preliminary settlement agreement.

Class counsel and Plaintiffs' Steering Committee ("class counsel") now seek attorneys' fees and expenses pursuant to that settlement agreement ("Agreement"). Class counsel requests an award of 25% of what they deem to be a $150 million fund, resulting in a fee of $37.5 million; Defendant urges the Court to award roughly 20% of the $60 million that it estimates has already been paid out under the fund, resulting in a fee of $12 million.

#### The Settlement Agreement

The Agreement, perhaps surprisingly, does not fix the amount of class counsel's attorneys' fees, instead leaving this matter to the Court's discretion. Thus the Agreement merely provides that "Class Counsel shall receive an award in an amount approved by the Court, based upon the Gross Amount of money and benefits received by the Class and Claimants from all settlement funds...." (Agreement ¶ 8.1.) "'Gross Amount' as used in paragraph 8.1" is defined by the Agreement as "Copley's maximum potential contribution to the settlement funds before any remittitur, i.e., $150,000,000." (Agreement ¶ 3.19.) Private fee arrangements between claimants and non-class counsel are also addressed by the Agreement, which provides that "the Court shall reserve the power to set maximum limits on contingent fees, and [ ] the Court may make appropriate reductions on such contingent fee amounts for the cost of 'common benefit' services provided by Class Counsel." (Agreement ¶ 8.3.)

While largely silent on the amount of the fees, the Agreement does explicitly address the allocation of fees. For Funds One, Two, and Three, the Agreement provides that each claimant meeting the fund's criteria will receive an award "less his or her pro rata share of attorneys' fees, costs, and administrative expenses." (Agreement ¶¶ 5.3.1, 5.4.1, 5.5.1.) Further, the Agreement provides that the money in Fund Four will be used for payments to claimants and for "payment of attorneys fees, litigation costs and administrative costs...." (Agreement ¶ 5.6.5.)

The Supplement to the Agreement broadens the definition of "Claimant" to include "Additional Claimants," or "those who timely requested exclusion from the class." (Supp. Agreement ¶¶ 3.6, 9.6.) However, the Supplement explicitly provides that "[n]o deductions will be made from any amounts paid to such Claimants for their pro rata share of attorneys' fees or litigation expenses awarded by the Court pursuant to paragraph 8.1." (Supp. Agreement ¶ 9.6.3.)

The Agreement also addresses Defendant's responsibilities regarding fees and expenses. The Agreement provides that "[i]f the total money paid from all settlement funds to Claimants and for attorneys' fees, litigation costs and administrative expenses pursuant to section 8 of this Agreement is more than $65,000,000," Defendant's remittitur will be reduced by "an amount equal to each Claimants' [sic] per capita share of attorneys' fees, costs, and administrative expenses awarded or paid pursuant to section 8...." (Agreement ¶¶ 5.3.3(ii), 5.4.3(ii), 5.5.3(ii).)

### Discussion

■ The settlement in this case created a "common fund" from which the plaintiff class obtained a benefit. In a rare exception to the American rule that parties bear their own costs in litigation, "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *see also Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1480, 1482 (10th Cir.1993);

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir.1988). This exercise of the federal court's historic equity jurisdiction, *see Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), prevents the unjust enrichment (at the successful litigant's expense) of "persons who obtain the benefit of a lawsuit without contributing to its costs," *see Boeing*, 444 U.S. at 478, 100 S.Ct. 745. Accordingly, the attorneys who contributed to the creation of the common fund in this case are entitled to a reasonable fee therefrom.

■ Before considering the proper methodology for awarding attorneys' fees out of a common fund, the Court feels compelled to define its role in these proceedings. When an attorney makes a claim for fees from a common fund, his interest is "adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class." *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993). This divergence of interests requires a court to assume a fiduciary role when reviewing a fee application, because there is often no one to argue for the interests of the class: class members with small individual stakes in the outcome will often fail to file objections because they lack the interest or resources to do so, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel. *Id.* Defendant in the instant case does possess a common interest with the class in the amount of fees and expenses awarded, because Defendant will share the burden of fees and expenses under the remittitur formulas provided by the settlement agreement. However, this interest potentially conflicts with those of the class because Defendant will only share this burden if a threshold of recovery is reached, and Defendant denies that this threshold has been reached. Thus the Court will follow the Tenth Circuit's instruction that a court must act as a fiduciary for the beneficiaries of a common fund, weighing the appropriate interests of the beneficiaries in light of the efforts of counsel on their behalf. *See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456

(10th Cir.1988) (quoting Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 251 (1985)).

■ The two competing methodologies for the award of attorneys' fees from a common fund are the lodestar method and the percentage of the fund method. In the Tenth Circuit, following *Brown* and *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 853 (1993), either method is permissible in common fund cases. *Gottlieb v. Barry*, 43 F.3d 474, 482–3 (10th Cir.1994). While there are advantages and disadvantages associated with each method, the Tenth Circuit has recognized the recent trend towards utilizing the percentage method in common fund cases, *see id.*, and in *Rosenbaum v. MacAllister*, the Tenth Circuit noted that it had expressed "a preference for the percentage of the fund method," 64 F.3d 1439, 1445 (1995). In all cases, whichever method is used, the court must consider the twelve *Johnson* factors to check the reasonableness of the fee awarded. *Id.* Thus the Court will consider whether, despite the Tenth Circuit's expressed preference, there are reasons to use the lodestar rather than the percentage of the fund method.

Traditionally, attorneys' fees in common fund cases were computed as a percentage of the fund, subject to considerations of reasonableness, and in every Supreme Court case that addressed the issue, the Court awarded attorneys' fees on a percentage of the fund basis. *See, e.g., Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Central R.R. & Banking v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881). In the 1970's, the Third Circuit initiated the move towards the lodestar method in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973), asserting that the percentage of the fund method frequently yielded fee awards that were excessive and unrelated to the work actually performed. Most federal courts quickly adopted the Third Circuit's reasoning and methodology. However, as courts employed the lodestar method with increasing frequency, it too was criticized for a variety of perceived failings, and many courts awaited an opportunity to return to the percentage of the fund method. Such an opportunity was presented when the Supreme Court described common fund cases as those in which "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Though merely dictum in a footnote, this indicated that the percentage of the fund method was a "reasonable" way to calculate fees in common fund cases. Subsequently, in 1985, a Third Circuit task force commissioned to study the problem of court-awarded fees asserted that the percentage of the fund method was the best way to achieve the goals of fair and reasonable compensation, predictability, simplification, discouragement of abuses, and fairness to the parties in common fund cases. Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985). The task force recommended a return to the percentage of the fund method for the determination of common fund attorneys' fees. *Id.* This report, ironically from the Circuit that initiated the adoption of the lodestar method, kickstarted the return to the percentage of the fund method. Currently, the Eleventh and District of Columbia Circuits have repudiated the use of the lodestar method in common fund cases, *see Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265–66 (D.C.Cir.1993); *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991), while the First, Third, Sixth, Seventh, Ninth, and Tenth Circuits have indicated that the percentage of the fund method is permissible or preferable, *see Williams v. MGM–Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir.1997); *Rosenbaum*, 64 F.3d at 1445 (10th Cir.); *In re Thirteen Appeals Arising Out of San Juan*, 56 F.3d 295, 307 (1st Cir.1995); *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 821 (3d Cir.1995); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir.1994); *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993). The Fifth Circuit alone appears to require the continued use of the lodestar

method. *See Longden v. Sunderman,* 979 F.2d 1095, 1099 n. 9 (1992).

This shift back towards the percentage of the fund method reflects its numerous advantages over the lodestar method. First, the percentage of the fund method will generally be less burdensome to administer in common fund cases than the lodestar method. *See, e.g., Swedish–Hosp.,* 1 F.3d at 1269. When using the lodestar method, a judge must review the voluminous time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended. This inquiry is not only tedious and time consuming—it is also highly subjective, requiring that the judge second-guess the judgment of counsel as to whether a task was reasonably undertaken or the hours devoted to it were reasonably expended. *See* Third Circuit Task Force Report, 108 F.R.D. at 246 ("The elements of the *Lindy* process are insufficiently objective and produce results that are far from homogeneous."). The percentage of the fund method, on the other hand, permits the judge to focus on "a showing that the fund conferring a benefit on the class resulted from the lawyers'. efforts." *Camden I,* 946 F.2d at 774. This is a far simpler inquiry. While the time billed by the attorneys remains relevant to the court's inquiry—potentially illuminating the attorneys' role in the creation of the fund and assisting the court's inquiry into the reasonableness of a particular percentage—the percentage of the fund method is less likely to produce collateral disputes over billing. This better respects the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Simply put, it is much easier and far less demanding of scarce judicial resources to calculate a percentage of the fund fee than to review hourly billing practices over a long, complex litigation. This is particularly relevant in the instant case, where class counsel have submitted time statements billing 48,794.11 hours.

Second, the percentage of the fund method rewards efficiency, while the lodestar method rewards inefficiency. The lodestar method encourages attorneys to bill as many hours as possible, preferably to a firm's most expensive attorneys, and discourages early settlement, even on terms favorable to plaintiffs, because the attorneys will earn more the longer a litigation lasts. *See* Third Circuit Task Force Report, 108 F.R.D. at 247–48. Both of these possibilities increase the court's burden when reviewing a request for fees and decrease the plaintiffs' recovery. The percentage of the fund method does not prevent the billing of excessive hours or insure that plaintiffs' attorneys will not reject the early settlement of a case where terms favorable to plaintiffs are offered, but neither does it reward these inefficient outcomes. Instead, under the percentage of the fund method, inefficiently expended hours only serve to reduce the per hour compensation of the attorneys expending them, and will not decrease plaintiffs' recovery.

Third, the percentage of the fund approach helps to align more closely the interests of the attorneys with the interests of the parties, *see Swedish Hosp. Corp.,* 1 F.3d at 1268–69, by tying the attorneys' recovery to the recovery of the fund's beneficiaries. While this alignment of interests collapses once a common fund has been recovered and a court must determine what percentage of the fund to award as fees, it initially provides an impetus for counsel to represent their clients' interests as vigorously as possible, rather than to bill as vigorously as possible.

Fourth, and finally, the percentage of the fund method better approximates the workings of the marketplace by focusing on the results achieved, and there is little apparent reason to treat common fund cases differently from how other similar cases are treated by the marketplace. As one district court noted, "[p]laintiffs' litigation practice, given the uncertainties and hazards of litigation, must necessarily be result-oriented. It matters little to the class how much the attorney spends in time or money to reach a successful result." *Howes v. Atkins,* 668 F.Supp. 1021, 1025 (E.D.Ky.1987) (internal quotation marks omitted). Chief Judge Posner, writing for the Seventh Circuit, opined similarly, stating that "[t]he judicial task might be simplified if the judge and the lawyers spent

their efforts on finding out what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character...." *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992).

This is not to imply that the percentage of the fund method is foolproof, or that it suffers from no disadvantages. For example, it may result in the overcompensation of counsel in situations where actions are resolved before counsel has invested significant time or resources. See Third Circuit Task Force Report, 108 F.R.D. at 242 (noting "criticism from within the profession" that fees under the Percentage of the fund method are sometimes "disproportionate to actual efforts expended by the attorneys"). This concern, however, while valid, has no relevance in the instant case where class counsel clearly invested significant time and resources in discovery, at trial, and in the administration of the settlement. Further, while the percentage of the fund method may result in an award to counsel disproportionate to the work done, this criticism is more properly considered criticism of the actual percentage awarded in a particular case, rather than criticism of the methodology for computing the award. Thus, on balance, the Court believes the percentage of the fund method is the preferable method for the computation of attorneys' fees in this common fund case.

The first step in a percentage of the fund analysis is a determination of the value of the fund. While disputed by the parties in this case, the matter is settled by the explicit terms of the Agreement. The Agreement provides that "Class Counsel shall receive an award in an amount approved by the Court, based upon the *Gross Amount* of money and benefits received by the Class and Claimants *from all settlement funds* ...." (Agreement ¶ 8.1 (emphasis added).) " 'Gross Amount' as used in paragraph 8.1" is defined by the Agreement as "Copley's maximum potential

contribution to the settlement funds before any remittitur, i.e., $150,000,000." (Agreement ¶ 3.19.) Thus the plain language of the Agreement supports a fee award based upon a common fund of $150 million.

Further, the remittitur provisions explicitly contemplate and provide a mechanism for payment of attorneys' fees and expenses from the entirety of the fund. The Agreement provides that "[i]f the total money paid from all settlement funds to Claimants and for attorneys' fees, litigation costs and administrative expenses pursuant to section 8 of this Agreement is more than $65,000,000," Defendant's remittitur will be reduced by "an amount equal to each Claimants' per capita share of attorneys' fees, costs, and administrative expenses awarded or paid pursuant to section 8...." (Agreement ¶¶ 5.3.3(ii), 5.4.3(ii), 5.5.3(ii).) The total money paid from all settlement funds to all "Claimants," which includes class and non-class claimants pursuant to the Supplement to the Agreement ¶ 3.6., will certainly exceed $65 million.[1] Thus the remittitur provisions of ¶¶ 5.3.3(ii), 5.4.3.(ii), and 5.5.3(ii) will kick in, providing a mechanism for *and explicitly requiring* the payment of attorneys' fees from the entire fund, including those portions remitted to Defendant. While Defendant is correct in its characterization of the fund value as binary—being either $65 million or $150 million—the $65 million threshold will certainly be surpassed, thus the Court will award attorneys' fees based on a common fund of $150 million.

The second step in a percentage of the fund analysis is an initial determination of the appropriate percentage to award. The standard contingency fee in individual actions is generally accepted to be 33%. In common fund cases, fees generally range from 20–30%, *see Camden I*, 946 F.2d at 774 (establishing benchmark percentage between 20–30%, but warning that this benchmark should

---

1. While the payments have not yet exceeded $65,000,000, the figures available to the Court (including information that Defendant has requested the Court not to release publicly, even in summary form) indicate that payments to class and non-class claimants (i.e., the Jacoby & Meyers claimants) currently total close to $62,000,000, with over one thousand four hundred claims

unresolved, and over one thousand four hundred class claims preliminarily denied. Not only will a large percentage of the unresolved claims likely be approved, but pursuant to the Court's Order Regarding Interpretation of the Agreement, many of the class claims preliminarily denied by the Special Master will likely be approved upon reconsideration.

not be applied "mechanically"), with the Ninth Circuit having established a benchmark fee of 25%, *see Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (1989). The present action, however, is an exception to the typical common fund case because of the size of the recovery.

■ Newberg's *Attorney Fee Awards*, which analyzes the range of awards in common fund cases, emphasizes that when a common fund is extraordinarily large, the application of a benchmark or standard percentage may result in a fee that is unreasonably large for the benefits conferred. *See* Herbert P. Newberg, *Attorney Fee Awards* § 2.09 (1986). Empirical research by Newberg and others reveals that courts are sensitive to this problem, reducing percentage awards as the size of the recovery increases. *See id.;* William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class–Action Litigation*, 23 J.Legal Stud. 185, 201 (1994); *see also* Third Circuit Task Force Report, 108 F.R.D. at 256 ("absent unusual circumstances, the percentage will decrease as the size of the fund increases"). This sliding scale, recommended by the Third Circuit in its report on attorneys' fees, *see id.*, is explained in part by economies of scale. It is not one hundred fifty times more difficult to prepare, try, and settle a $150 million case than it is to try a $1 million case—in a particularly pertinent example, this class action was certified, discovery completed, and 42 days of trial completed within one year—but the application of a percentage comparable to that in a smaller case would yield an award 150 times greater. Thus where fund recoveries range from $51–$75 million, fee awards usually fall in the 13–20% range. *See* Newberg, at § 2.09; Lynk, 23 J.Legal Stud. at 201. In megafund cases like this one, wherein a class recovers $75–$200 million (or more), courts most stringently weigh the economies of scale inherent in class actions in fixing a percentage yielding a recovery of reasonable fees. *See* Newberg, at § 2.09. Accordingly, fees in the range of 6–10% and even lower are common in megacommon fund cases. *Id.*

■ Having gained an initial indication that the appropriate percentage ranges from 6–10%, resulting in an award of $9–15 million, the Court must determine what percentage within this range to apply, and whether the resulting award is reasonable. The *Johnson* factors, articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), will assist the Court in doing both. The *Johnson* factors consider: · (1) the time and labor involved; (2) the novelty and difficulty of the legal and factual questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other work by the attorneys; (5) the customary fee; (6) any prearranged fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19. The Tenth Circuit has recognized that the weight of the *Johnson* factors will be different in common fund cases, *see Uselton,* 9 F.3d 849, 853 (10th Cir.1993), and that rarely will all of these factors be applicable, *id.; Brown,* 838 F.2d at 456.

Considering the relevant *Johnson* factors, and excluding those addressed elsewhere by the Court, the Court first notes that class counsel expended over 48,794.11 hours to reach the settlement of this litigation, clearly an enormous investment of time and energy. Further, the expedited nature of the litigation, with class certification, discovery, and forty-two days of trial all occurring within one year, required that class counsel focus almost exclusively on this litigation during that time period. This focused and diligent labor was also required because of the novelty and difficulty of the legal questions involved: not only was the certification of this class a complex question, but this was also the first and only mass tort class action to go to trial, and the case presented complex medical and scientific issues of causation (for example, the formation of biofilms, the endotoxin response, the formation of colonies of pseudomonas, etc.). Thus, the skill required to perform the legal service presented by the instant case was great, particularly where

class counsel were faced with opposing counsel of such high quality.

While it is beyond dispute that class counsel are among the nation's most experienced, reputable, and skilled plaintiff's attorneys, class counsel's skill is further demonstrated by the result achieved. A settlement was reached that provided sufficient funds to afford relief to all claimants, potentially yielding $150 million to satisfy claims. This settlement provided relief a mere twenty-two months after the first Albuterol claims were filed, and did so in an inexpensive and efficient manner that allowed claimants to forego the burden of proving individual causation. This was an enormous victory for claimants, because the outcome of the trial was far from certain. Finally, the Court notes that the small size of most claims in the class made them particularly undesirable for most attorneys—class action was in many ways the only means of redress for these claimants, requiring an enormous investment of time and resources with no guarantee that counsel would recoup most or any of this investment.

Thus, not only does the Court find that the combined weight of these factors indicates that an award at the upper end of the 6–10% range would be reasonable, but further, the Court believes that the combined weight of these factors militates in favor of an additional upward increase in the fee award. Therefore, the Court finds that an award of 13%, yielding a fee of $19.5 million, would be reasonable, largely because this case is sui generis.

In an attempt to validate this award by confirming that it bears some relation to the work performed by counsel, the Court will perform a rough lodestar analysis. Taking all of counsel's claimed hours (48,794.11) as legitimate, the proposed award of $19.5 million yields an hourly rate of $400 for all attorney *and paralegal* work.[2] While this is obviously a highly lucrative hourly rate, the Court believes that it accurately reflects the merits of the work done by counsel, as demonstrated by the application of the *Johnson* factors. Looked at another way, this could be considered the $200 per hour fee used as a reference by class counsel[3] with a multiplier of 2, reflecting the contingent nature of the action and, albeit slightly, the quality work done by class counsel.

Under the *Lindy* lodestar methodology, a court may adjust the reasonable fee for the hourly work done by counsel to reflect the contingent nature of the litigation and the quality of the attorneys' work. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973). Having previously noted the quality of the work performed by class counsel (which by itself would justify only a slight multiplier, the Court being of the opinion that quality work should be the norm rather than the exception, and recognizing that the quality of work is to some extent reflected in the $200 per hour rate for attorney and paralegal work), the Court believes that the contingent nature of this action would justify a multiplier. *See* Third Circuit Task Force Report, 108 F.R.D. at 265 (suggesting that courts consider the "contingency factor" in all common fund cases). As noted previously, class counsel in this case bore the risk of failing to achieve a successful and substantial result for the class. Any fee to be recovered as compensation by class counsel in this matter was contingent upon obtaining an award for the class, and counsel performed this enormous task, working almost full-time on this case, with the expectation of receiving their fee solely out of the award in an amount to be determined by the Court. Despite their vig-

2. By way of comparison, counsel's request for a fee of $37.5 million would be an hourly rate of $769 per hour. This would obviously be excessive. *See, e.g., Rosenbaum v. MacAllister*, 64 F.3d 1439, 1447 (10th Cir.1995) (stating that the court's conscience was shocked by an award that resulted in a fee equal to $900 per hour).

3. For purposes of this analysis, the Court will accept this hourly rate. While this figure somewhat exceeds the rate normally charged in Cheyenne, the Tenth Circuit permits an award based on higher-than-local rates where, as in the instant case, the party or parties are represented by out-of-town counsel whose rates are higher than those charged locally. *See Gottlieb v. Barry*, 43 F.3d 474, 485 n. 8 (1994).

orous and competent efforts, success in contingent litigation is never assured, and the possibility of failure was heightened by the novelty and difficulty of the procedural, medical, and scientific questions presented by this case. Thus the Court finds that the multiplier of 2 would appropriately reflect the contingent nature of this action.[4]

While counsel may be dissatisfied, having requested some $37.5 million in fees, a look at comparable cases indicates that the Court has been particularly generous. *See, e.g., Bowling v. Pfizer, Inc.,* 922 F.Supp. 1261, 1283 (S.D.Ohio 1996) (awarding attorneys' fees of $10.25 million, or 10%, where the court valued the settlement at $102.5 million); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297 (N.D.Ga.1993) (awarding attorneys' fees of $14.3 million, or 5.25%, where the court valued the settlement at $305 million, of which $50 million was a cash fund); *see generally* Third Circuit Task Force Report, 108 F.R.D. at 256 (noting that in the *Agent Orange* litigation, plaintiffs' counsel were awarded less than 6% of the settlement fund). This generosity was largely motivated by the unprecedented nature of taking a mass tort class action to trial within one year. Further, the Court's lodestar analysis gave counsel the benefit of the doubt: the Court can assure counsel that under a rigorous lodestar analysis, a significant portion of their claimed hours (and billing rates) would be seriously questioned. Thus the actual hourly rate at which counsel were compensated is in all likelihood well above $400, or put another way, the multiplier is in all likelihood greater than 2. Finally, the Court considers it highly relevant that payments to claimants under the settlement will most likely only amount to $75 million, well under the $150 million upon which the Court based its calculations. As noted previously, various empirical studies show that the average percentage awarded for fees was 13–15% where the common fund recovered was

$75 million. *See* Herbert P. Newberg, *Attorney Fee Awards* § 2.09 (1986); William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class–Action Litigation,* 23 J. Legal Stud. 185, 201 (1994). In the instant case, 15% of the $75 million actually paid to claimants would be $10.75 million, far below what counsel will receive under the Court's determination. And the $19.5 million that counsel will receive under this order represents 26% of the actual funds paid out, almost exactly the percentage counsel requested in its petition (though this percentage was obviously requested from a larger sum). The Court believes that this consideration of the actual benefit to the class is necessary, lest class counsel receive a fee disproportionate to the actual benefit bestowed upon the class by their actions. Thus the Court finds that an award of 13% of the $150 million fund, or $19.5 million, is reasonable and warranted in this case.

Having found that class counsel should receive 13% of the fund as a fee, the Court must determine how the fee will be borne. Though this was a matter of some contention in the parties' briefs and at the hearing on the fee award, there seems to be little reason (other than the enormous sums of money at stake) for the dispute. For Funds One, Two, and Three, the Agreement provides that each Claimant meeting the fund's criteria will receive an award "less his or her pro rata share of attorneys' fees, costs, and administrative expenses." (Agreement ¶¶ 5.3.1, 5.4.1, 5.5.1.) The Agreement also provides that the money in Fund Four will be used for payments to Claimants and for "payment of attorneys fees, litigation costs and administrative costs...." (Agreement ¶ 5.6.5.) The Settlement Notice similarly provides that "[a]n amount which represents each claimant's proportionate share of attorneys' fees and litigation costs awarded by the Court and

---

4. The Supreme Court has rejected the use of multipliers to enhance the lodestar's hourly rate amount in statutory fee-shifting cases, *see City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), but it has not rejected the use of multipliers in common fund cases. While this Court recognizes that much of the Supreme Court's reasoning in *Dague* is appli-

cable to the use of multipliers in common fund cases as well, the Court points out that it has not set class counsel's fee with the lodestar method, and has instead merely used the lodestar method as a rough crosscheck of the result reached with the percentage of the fund method and the *Johnson* factors.

any administrative expenses incurred in connection with the settlement will be deducted from *each* claimant's award." (Settlement Notice, at 5–6 (emphasis added).) Thus each class claimant's award will be reduced by the 13% fee award to class counsel.[5]

■ Defendant's remittitur will be similarly reduced by the 13% fee award to class counsel. As noted previously, the Agreement provides that "[i]f the total money paid from all settlement funds to Claimants and for attorneys' fees, litigation costs and administrative expenses pursuant to section 8 of this Agreement is more than $65,000,000," Defendant's remittitur will be reduced by "an amount equal to each Claimants' per capita share of attorneys' fees, costs, and administrative expenses awarded or paid pursuant to section 8. . . ." (Agreement ¶¶ 5.3.3(ii), 5.4.3(ii), 5.5.3(ii).) This $65 million threshold is certain to be reached, thus Defendant's remittitur will be reduced by 13%, an amount equal to each claimant's per capita share of fees. The allocation of the fee award between the various firms and attorneys who made up class counsel is left to those parties. *See Howes v. Atkins,* 668 F.Supp. 1021, 1025 (E.D.Ky.1987) (leaving allocation of award to counsel); Newberg, § 2, at 53–54 ("When multiple law firms participated jointly in recovering a common fund for the benefit of the class, the court should reach an overall reasonable fee award for all counsel based on a fair percentage of the fund, and rule that allocation of the fund is a private matter among counsel.").

The payment of attorneys' fees by claimants is obviously standard practice under the American rule. However, the sharing of this burden by Defendant might in some sense appear to be fee shifting. As noted previously, this is permissible under *Boeing,* in which the Supreme Court concluded that attorneys for a class may recover a fee based on the entire fund created for the class, even if

some class members make no claims against the fund so that money remains in the fund upon which defendant has a claim of right. *See Boeing,* 444 U.S. at 481–82, 100 S.Ct. 745. Further, this case involves a settlement negotiated at arms length, rather than a judgment. Under the terms of that settlement and its remittitur provisions, Defendant not only knew that class counsel would seek to recover fees based on the gross amount of the fund recovered (regardless of whether some part of that fund was not claimed), but also agreed to a mechanism and formula by which class counsel could do so. Thus Defendant cannot complain now that class counsel seek to do what the settlement·agreement explicitly contemplates. *See Williams v. MGM–Pathe Communications Co.,* 129 F.3d 1026, 1027 (9th Cir.1997) (stating that a party had little right to complain about being held to the explicit terms of its own settlement agreement).

■ There are also roughly 600 private attorneys in this case with separate contingency fee agreements with individual claimants. The Agreement provides that "the Court shall reserve the power to set maximum limits on contingent fees, and [ ] the Court may make appropriate reductions on such contingent fee amounts for the cost of 'common benefit' services provided by Class Counsel." (Agreement ¶ 8.3.) Class counsel asked the Court to make a single percentage award for all attorneys' fees, ostensibly levied against each claimant's award, out of which class counsel would pay some indeterminate portion to the private attorneys. To do so, however, would result in an award to private attorneys borne in part by claimants who had received no services or benefit from the actions of the private attorneys, and would provide a windfall to those claimants on whose behalf the private attorneys labored.[6] Thus the Court finds that it is more

---

5. Non-class claimants will not share this burden. The Supplement to the Agreement provides that "[n]o deductions will be made from any amounts paid to [non-class] Claimants for their pro rata share of attorneys' fees or litigation expenses awarded by the Court pursuant to paragraph 8.1." (Supp. Agreement ¶ 9.6.3.)

6. A private attorney's labor may have increased the amount of a claimant's award, or the private attorney may have assisted with an appeal of the Special Master's initial determination. In either instance, the private attorney's work benefited an individual claimant rather than the class, thus that claimant should bear the cost of that attorney's services.

equitable to reduce the private attorneys' contingency fees to reflect the common benefit services provided by class counsel.

The Court has awarded class counsel a fee of 13%, and could simply reduce proportionately the private attorneys' fees to reflect this award and the labor it represents. This percentage fee award, however, reflects the economies of scale inherent in large class actions, and should not provide a windfall to the private attorneys. If this had been a smaller fund, the Court would have awarded counsel roughly 25%, generally accepted as the benchmark award in common fund cases. This award would have left the private attorneys with less than one third of the standard contingency fee. This action, however, involves tort claims—claims that require individual counsel to participate in their investigation and presention, unlike the securities claims often at issue in common fund cases. Thus a slight decrease in class counsel's award, leaving the private attorneys with one third, would be justified. This allocation seems fair because there is no indication that the private attorneys were sufficiently involved to justify a substantially larger award: class counsel shouldered the vast majority of the burden in this case during discovery, at trial, and in the settlement negotiations and administration. Therefore, the Court will reduce private attorney contingency fees for Fund One, Two, and Three claimants by two thirds (leaving the private attorneys with one third) to reflect the common benefit services provided by class counsel.[7]

The Court will also grant class counsel's request for reimbursement of reasonable litigation expenses totaling $1,630,159.20. As noted in the Court's discussion above, the Agreement provides that each claimant's award and Defendant's remittitur will be reduced by a pro rata share of litigation expenses. The Court accepts class counsel's fee expenses not merely because they appear reasonable, particularly in light of the number of hours expended by class counsel and the size of the fund recovered, but also because they have not been challenged by Defendant. While in most common fund cases the Court would not rely upon Defendant's failure to challenge class counsel's requested expenses, in the instant case, Defendant possesses an interest in limiting litigation expenses because it will pay an amount roughly equivalent to that borne by claimants.

These expenses will be deducted as 2% of each claimant's award and Copley's remittitur (thus 15% will be deducted for fees and expenses), creating a fund of $3 million with which the Special Master shall pay the expenses submitted by class counsel. The Special Master shall retain the excess for payment of further expenses, with any excess following resolution of all claims returned pro rata to Copley and class claimants. Finally, the interest (currently some $7 million) which has accrued for the benefit of the class, (Agreement ¶ 5.9.2), shall be retained by the Special Master until resolution of all claims, at which time it shall be disbursed pro rata to all class claimants.[8]

---

7. The Court recognizes that individual plaintiff's counsel will have far more involvement in the resolution of wrongful death claims under Fund Four, thus these counsel should receive a greater percentage of their bargained for fees. However, class counsel should receive the 13% fee award as compensation for the creation of Fund Four. Thus the Court will reduce private attorney contingency fees for Fund Four by one third (leaving these attorneys with two thirds) to reflect the common benefit services provided by class counsel.

8. The Court recognizes that these calculations may appear to have a Rube Goldberg quality. However, these mechanisms are necessary to respect the intent of the Agreement and to insure that the burden of the litigation costs is equitably shared. For example, while it would be far simpler to award the attorneys' fees and ex-

penses (at least in part) from the interest that has accrued on the fund, this would allow Defendant to escape (at least partially) its obligation to pay its portion of the fees and expenses. Thus the Court's somewhat intricate calculations insure that only the class claimants benefit from the interest, as only they should under the Agreement, and forces Defendant to bear its full burden of fees and expenses, as it should under the Agreement. In yet another example, were the Court to decrease the contingency fee of each private attorney by an absolute figure (e.g., 22%), rather than awarding each private attorney 1/3 of his or her bargained for fee, those attorneys with low contingency fees (e.g., less than 22%) would receive nothing for their work. The Court believes that slightly easier calculations would not justify these inequitable results. The Court also notes that pro rata distribution amongst the claimants, or between the class and Defendant, is

### Conclusion

Some may object that the fee awarded, even limited as the Court believes it is, is excessive or unwarranted. The Court is sensitive to the fact that there has been heightened criticism of the exorbitant fees awarded in some class actions. Class actions, however, cannot be analyzed within the same framework or judged by the same standards as conventional bipolar litigation. Because of the collective action problems associated with cases where individual claims are relatively small, *see* 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1754, at 49; *see generally,* Mancur Olson, *The Logic of Collective Action* (1965), and the social desirability of many class suits, large fee awards may be necessary and desirable to motivate capable counsel to undertake class actions. This is particularly important in a case like this one, where the class is largely composed of negative value suits: the highest standard award provided by the settlement ($20,000) is certainly not enough to cover the expenditure required to prevail in a complex scientific case with novel issues of causation. As noted by the Supreme Court, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, persons may be without any effective redress unless they employ the class action device." *Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 329, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). And without counsel willing to pursue a class action, this method of redress is effectively foreclosed.

Further, this class action settlement is not subject to many of the criticisms leveled against other class action settlements. By providing in the settlement agreement that the Court would set the amount of attorneys' fees, the parties precluded the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 524

(1st Cir.1991). And, as noted previously, the settlement of this case was not premature, instead coming after class counsel had invested significant time and resources in discovery and at trial. Thus there was no risk that the application of the percentage of the fund method would result in overcompensation of class counsel who had not yet invested significant time or resources in an action.

Finally, the Court notes that while class counsel are rewarded handsomely, it is actually the claimants who have received a windfall: the standard contingency fee is 33%, thus the claimants have received class counsel's services at roughly one third of the market rate. The Court believes that this 13% fee award is reasonable, and not only reflects the quality work done by counsel and the unique aspects of this case, but also satisfies the Court's fiduciary role and protects the interests of the claimants.

THEREFORE, it is hereby ORDERED that class counsel shall receive a fee award of 13% of the $150 million common fund created, for an award of $19.5 million, to be allocated amongst themselves by class counsel; and it is further

ORDERED that each class claimant's award and Defendant's remittitur shall be reduced by 13% for class counsel's fee award and by a further 2% for payment of expenses; and it is further

ORDERED that each private attorney for a Fund One, Two, or Three claimant shall receive one third (1/3) of his or her bargained for contingency fee, while each private attorney for a Fund Four claimant shall receive two thirds (2/3) of his or her bargained for contingency fee.

---

not so difficult as it might at first appear because of the standardized size of the awards and the

funds.